Henry A. GEHRHARDT, Plaintiff,

v.

GENERAL MOTORS CORP., Defendant.

No. 75 Civ. 5766.

United States District Court,
S. D. New York.

June 27, 1977.

---

Hays, St. John, Abramson & Heilbron, New York City, for plaintiff by Joseph Kevin McKay, Edward F. Campbell, Jr., New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for defendant by Roy L. Reardon, Harold S. Parsons-Lewis, New York City, of counsel.

## OPINION

WHITMAN KNAPP, District Judge.

This is a diversity action by a former employee of General Motors Corporation against his former employer. Plaintiff had been general manager of the corporation's New York City Cadillac retail division until July, 1972 when the corporation closed down its Cadillac retail operations and liquidated this division. Prior to the closing plaintiff applied for and accepted a franchise from the corporation to be its Cadillac dealer for the Borough of Brooklyn. Upon leaving the corporation's employ plaintiff requested certain benefits available under the corporation's pension plan, generally speaking, to all terminated employees except those

> "separated . . . (whether by resignation or under mutually satisfactory conditions) for the purpose of becoming a distributor of, or a dealer in, some General Motors product, or of entering the employment of such a distributor or dealer . . . ."

The corporation, reasoning that plaintiff had left under mutually satisfactory conditions for the purpose of becoming a dealer,

denied the requested benefits.[1] The pension plan purported to make management's decision in pension matters conclusive on all parties concerned.

Upon such denial, plaintiff instituted this action. A plaintiff's verdict was returned by the jury. Defendant now moves pursuant to Rule 50(b) for a judgment notwithstanding the verdict or in the alternative for a new trial. For reasons which follow, the motion is granted.

Having at no time contended that the corporation was guilty of any fraud or overreaching, plaintiff seeks to support the verdict on two theories: *First,* he contends that the jury was justified in finding that the corporation had acted arbitrarily in distinguishing between him and other terminated employees who, he claims, were similarly situated but were awarded the benefits denied to him; *second,* he contends that the jury was justified in finding that the corporation had acted arbitrarily in concluding that plaintiff had left its employ for the purpose of becoming a dealer rather than concluding that he had applied for and accepted a dealership only because the corporation had terminated his job and had not offered him other employment.

## I

The first contention may be summarily disposed of. Many of the retail division's employees were given jobs by dealers who took over Cadillac's retail business in New York City. Only two, plaintiff and one William T. Daly (plaintiff's partner), received a dealership in their own right. The corporation made a distinction between those who became employed by dealers and those who became dealers themselves, granting the desired benefits to the former and withholding them from the latter. It was established that the corporation had made similar distinctions in closing down its retail operations in other metropolitan areas.[2]

Although the corporation may have had the right under the language of its pension plan to withhold benefits from its departing employees who took jobs with its dealers, it cannot be reasonably argued that it was arbitrary in distinguishing between employees and entrepreneurs and in being more generous to the former.[3]

## II

Before plaintiff's second contention can be intelligently discussed we must determine the standard of review by which corporate action in this field is to be judged.[4] The general rule is set forth in Judge Gurfein's opinion in *Wyper v. Providence Washington Ins. Co.* (2d Cir. 1976) 533 F.2d 57. The court there (upon facts having no similarity to those at bar) affirmed the grant of a directed verdict against an employee who had challenged a corporation's decision to deny him certain pension rights. The court ruled that although, as a matter of substantive law, a corporate pension plan may provide that the decision of management is "conclusive", the courts may still review management decisions in order to guard against caprice

---

1. Plaintiff did receive certain benefits at the time of his termination but claims he was improperly denied certain other pension benefits including a separation allowance.

2. As we are dealing with the verdict of a jury, we state no fact in this opinion which is unfavorable to the plaintiff's position unless it stands uncontested in the record.

3. Plaintiff's salary at the corporation at the time he separated was $32,000 per year. Upon becoming a dealer his salary increased to $35,000, even though the Brooklyn dealership was losing money at the time. In addition, plaintiff received certain fringe benefits as a dealer, which included the use of a new Cadillac. By 1976 the dealership had become quite profitable, grossing $14,000,000 in sales. Plaintiff's salary had increased to $50,000. In addition he earned a $74,000 bonus. This, of course, is in addition to the increase in value of his 50% ownership in the dealership.

4. As the parties have stipulated, plaintiff's employment having terminated in July, 1972, the provisions of the 1974 Employees Retirement Income Security Act, 29 U.S.C. § 1001 et seq., (ERISA) are inapplicable. Compare *Amory v. Boyden Associates, Inc.* (S.D.N.Y. 1976) 434 F.Supp. 671.

or fraud. The court noted, however, that the standards of such review are narrow, observing (at 62):

> "The burden is on the plaintiff to show that the board's ruling was motivated by bad faith or fraud or the result of arbitrary action."

Among the cases cited for this proposition was the New York Court of Appeals decision in *Gitelson v. DuPont* (1966) 17 N.Y.2d 46, 49, 268 N.Y.S.2d 11, 13, 215 N.E.2d 336. At the page cited, the New York court had cited the Appellate Division decision in *Pasternack v. Diamond* (1st Dept. 1957) 3 A.D.2d 422, 423, 161 N.Y.S.2d 277, 278, *aff'd* (1958) 5 N.Y.2d 770, 179 N.Y.S.2d 864, 154 N.E.2d 141 as setting forth reasoning "adopted by this court." The *Pasternack* court, in reversing a judgment directing an employer to honor an employee's claim to a pension, had observed (3 A.D.2d at 423, 161 N.Y.S.2d at 278):

> "The record contains proof sufficient to sustain the Board's action in denying plaintiff's application for a pension. The court may not substitute its judgment for that of the trustee on the disputed factual issues."

We therefore conclude that, under New York law by which we are bound and which in this situation has—indirectly at least— been approved by our own Court of Appeals, the only question before the jury was whether the "record contains proof sufficient to sustain the [corporation's] action in denying plaintiff's application" for pension benefits. Against this background, we review the evidence before us.

As of the date of his separation, plaintiff had been an employee of the corporation for a period of 17 years. He had an exemplary—indeed outstanding—record of service. His promotion from position to position had been regular. About one year prior to his separation he had been made general manager of the corporation's New York retail Cadillac division when the previous holder of that position, one Mr. Heaphy, had been promoted to Regional Manager of the New York Zone. Plaintiff's testimony indicated that Heaphy's new responsibilities were confined to wholesale operations.

It had been plaintiff's life's ambition to acquire a Cadillac dealership, and he made no secret of that ambition.[5] Indeed in 1965 and again in 1967 he had written letters to the corporation stating such ambition, and urging his superiors to be on the look out for any opportunities that might become available to him. This ambition of plaintiff's was apparently consistent with the aspirations of corporation employees in his line of activity, as illustrated by the fact that Heaphy, plaintiff's predecessor whose own job was in no way threatened by the corporation's realignment of its retail activities, resigned the position to which he had been promoted in order to accept a Cadillac dealership in New Rochelle.

In December 1971, when plaintiff learned of the corporation's plans to close down its retail activities, he wrote a letter to the head office in Detroit asking that he be considered for the Bronx dealership. For a time he was hopeful of getting this dealership, but it ultimately became unavailable.[6]

---

5. Plaintiff on the witness stand never denied that a Cadillac dealership had been his life's ambition. However, he contended that with advancing age the security of pension benefits had come to seem more attractive to him, and he had modified his aspirations. He did not suggest that he had ever advised his superiors of his new outlook.

6. For reasons we were never able to understand, the defendant corporation allowed this unavailability to stand unexplained in the record. Actually,* it was due to a corporate decision to make dealerships available to Blacks and other minorities, especially in areas where such Blacks and minorities constituted substantial percentages of the corporation's customers. The unavailability being wholly unexplained, the jury undoubtedly got the impression that it was due to favoritism or some other corporate caprice. The parties probably reasoned—quite correctly—that arbitrariness in withholding franchises was totally irrelevant to the question before the jury, i. e. alleged arbitrariness in withholding pension benefits. Nevertheless, it seems to us inevitable that the atmosphere of capricious corporate action must have had an unsettling effect upon the jury.

\* as we were advised in the course of a bench colloquy.

Upon learning of such unavailability, plaintiff immediately went to Detroit for a conference which ended in a "handshake" agreement that plaintiff would be offered and would accept the Cadillac dealership for Westport or Brooklyn, whichever became available (Brooklyn being plaintiff's second choice of the two). The Brooklyn dealership ultimately did become available and was accepted by plaintiff, the corporation providing him with a substantial loan to get the business started.

The dismantling of the corporation's New York retail division took several months to accomplish. As the division's general manager, plaintiff was intimately concerned with the dismantling operation. The Detroit official most concerned with this dismantling was one Bernard Baldwin, who was also the official principally responsible for corporate decisions in pension matters. Plaintiff and Baldwin were in intimate contact at least weekly—and some times daily—during the entire period. Baldwin and plaintiff both testified that plaintiff did not once say anything to Baldwin which might even remotely suggest that he had relinquished his life-long ambition to become a Cadillac dealer, or that he would have accepted any form of employment within the corporation at the very moment such ambition was about to be realized. It was also established that plaintiff never asked Baldwin or any other official to be considered for any other corporate position.[7]

■ We conclude, on the basis of the foregoing facts, that it could not rationally have been found that the record fails to contain proof "sufficient to sustain the [corporation's] action" in deciding that plaintiff had terminated his employment "for the purpose of" accepting the Cadillac dealership.

Of course, as plaintiff points out in his post-trial memoranda, the record also contains evidence which might have supported a contrary decision. For example, plaintiff testified that in the course of his "handshake" conference in Detroit he had asked a corporate officer "What do we do with our lives after June 30?", and had been told that he could "always maybe work for a dealer like Mr. Potamkin until something comes along." Mr. Daly, plaintiff's partner, who was also present at that meeting, testified that he had engaged in the following exchange with the official involved:

"I said 'In other words, as of July 1 we are no longer with Cadillac Motorcar Division?' And he said, 'yes'."

The corporation might have inferred from the foregoing that, despite his outstanding record and the fact that his immediate predecessor was in the process of vacating the position to which he had been promoted from the very one plaintiff then held, plaintiff was nevertheless under the impression that there was no opening for him in the corporation. Plaintiff contends that such an inference might have been buttressed by the fact that plaintiff's personnel files contained a notation made some eight months previously that more experience in his present position would be required before he would be advanced to one of greater responsibility; and by the further fact that plaintiff's experience had been exclusively confined to retailing while the position his predecessor was vacating was largely (if not exclusively) concerned with wholesaling.[8]

However, it cannot reasonably be argued that the corporation was *required* to draw from those isolated bits of evidence an inference that plaintiff did not leave under mutually satisfactory conditions for the

---

7. At trial plaintiff flatly asserted that he had never asked about further corporate employment (Tr. 127). However, defendants' counsel confronted him with certain ambiguous deposition testimony which counsel seemed to think suggested that he had made such a request. (Tr. 128–129). We agree with the position plaintiff took on the witness stand that this deposition testimony did not contradict his assertion at trial.

8. The record is silent on the question of whether plaintiff's predecessor's experience had been significantly different from plaintiff's when the former was promoted to the position he was in the process of vacating.

purpose of becoming a dealer. The corporation was entitled to give greater weight to the overwhelming evidence of plaintiff's life-long ambition and to his failure to request of any corporate official that he be considered for further employment within the corporation. This is especially so in light of plaintiff's demonstrated ability (shown by his various letters and his trip to Detroit) to make his desires and aspirations known to his superiors.

Since the corporation was not required to draw such inference and since the evidence before it was clearly sufficient to sustain the inference it did draw, this court is without power "to substitute its judgment for that of the [corporation] on the disputed factual issues." It follows that the jury's verdict—which constituted precisely such a substitution of the jury's judgment for that of the corporation—must be set aside and the complaint must be dismissed.[9]

### III

It has been our experience that whenever a jury goes wrong the fault almost invariably lies with counsel or the court. This case is no exception. In light of our post-trial research it is painfully apparent that the charge was wholly inadequate. It gave the jurors no meaningful guidance as to the scope of their authority to review corporate decisions.

Accordingly, although the defendant took no appropriate exceptions to our charge, 6A Moore's Federal Practice ¶ 59.-08[2], at 59–106 to 107, in the exercise of our discretion and to prevent a miscarriage of justice, we in the alternative set aside the verdict and grant a new trial.[10] Cf.

Montgomery Ward and Co. v. Duncan (1940) 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147; Haber v. County of Nassau (2d Cir. 1977) 557 F.2d 322 at 324.

The motion for judgment notwithstanding the verdict is granted, and the complaint is dismissed. In the alternative, a new trial is granted.

Let defendant submit an appropriate judgment on five days' notice.

---

9. Perhaps misled by the court's charge (see Part III infra), plaintiff's post-trial memoranda proceed on the theory that the jurors were entitled to draw inferences from the evidence on which the corporation acted. On the contrary, once it was established exactly what evidence was available to the corporation when it made its decision (as to which see footnote 2 supra), this court—of which the jury is a part—was required to give the corporation the benefit of any inference it might reasonably draw from such evidence.

10. We grant this discretionary alternative relief solely on the basis of inadequacies in the charge and not on the evidence. Cf. Compton v. Luckenbach Overseas Corp. (2d Cir. 1970) 425 F.2d 1130, 1133, cert. denied (1970) 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155. In view of the disparity of the parties' financial resources, we would not burden plaintiff with the expense of another trial if we had found the evidence sufficient to go to the jury and the charge adequate.