**Henry A. GEHRHARDT,
Plaintiff-Appellant,**

v.

**GENERAL MOTORS CORPORATION,
Defendant-Appellee.**

**No. 453, Docket 77–7440.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 16, 1978.
Decided June 21, 1978.

Joseph Kevin McKay, New York City (Hays, St. John, Abramson & Heilbron, New York City, of counsel), for plaintiff-appellant.

Roy L. Reardon, New York City (James S. Frank, Simpson Thacher & Bartlett, New York City, Otis Smith, Gen. Counsel, General Motors Corp., Detroit, Mich., of counsel), for defendant-appellee.

Before MOORE, SMITH,* and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

Appellant, a former long-time employee of General Motors ("GM"), who brought this action against it in the Southern District of New York for recovery of separation and retirement benefits, appeals from a judgment n. o. v. dismissing his complaint after a jury trial. The action was based upon appellant's claim that GM arbitrarily classified him as "specially separated" rather than "laid off" when he ceased working for that corporation and acquired ownership

---

* Judge Smith having requested that he be relieved of any consideration of this appeal, this decision is rendered solely by Judges Moore and Mansfield, who are in agreement, pursuant to the Rules of this Court, § 0.14(b).

of an independent Cadillac distributorship.[1] The classification deprived him of substantial benefits that might otherwise have become due him under his employment contract with GM.

A jury verdict in appellant's favor was set aside by Judge Whitman Knapp in a decision reported at 434 F.Supp. 981. Judgment was entered for GM and a new trial ordered in the event of reversal.[2] We affirm the decision granting GM judgment notwithstanding the verdict and therefore need not reach the propriety of the order in the alternative for a new trial.

■ This case arose out of GM's decision, eventually implemented in 1972, to divest itself of its Cadillac retail operation in New York City. Under this reorganization GM replaced its own retail organization with a number of independent Cadillac dealerships, resulting in the abolition of some 500 GM jobs, including the one then held by appellant—Manager of the Cadillac Division's New York City branches. After appellant learned in late 1971 or early 1972 of GM's plans, he and one William Daly, another GM employee, promptly applied to purchase GM's proposed Bronx Cadillac dealership. GM rejected this offer, and subsequently appellant and Daly met with Cadillac's general sales manager in Detroit. According to appellant's testimony—which we must for present purposes assume to be true[3] —the sales manager told Daly and appellant that there would be no jobs for them in GM itself if the corporation should implement its reorganization plan, but promised them that they could purchase a Cadillac dealership in either Westport, Conn., or Brooklyn, N.Y. Appellant and Daly did in fact acquire the Brooklyn dealership on July 5, 1972, and have since been quite successful in that venture. By becoming a dealer, appellant achieved what he had described in a letter to GM in 1965 as his "lifelong ambition."

As part of the effort to close down the New York City retail operation, the GM personnel department classified every New York City area employee for purposes of assigning pensions and separation benefits. These benefits are outlined in an employee handbook entitled "Working With General Motors." It states in part that "In determining the separation classification, Management shall be the sole judge", and it provides:

"*Separations to Become Distributors or Dealers or Employes Thereof:* An employe who is separated prior to age 60 (whether by resignation or under mutually satisfactory conditions) for the purpose of becoming a distributor of, or a dealer in, some General Motors product, or of entering the employment of such a distributor or dealer, shall be classified as a special separation and shall not be eligible for a separation allowance."

Pursuant to this paragraph the personnel director of the Cadillac Division of GM, James Baldwin, classified appellant and Daly as "special separations." With no relevant exceptions all other employees whose jobs were being abolished, including a number who were to become employees of GM dealers, were classified as "lay-offs" and thus eligible for substantially greater separation allowances than that given to appellant. When he was informed of GM's deci-

---

1. Federal jurisdiction over this case is based on diversity of citizenship. Since all of the events relevant to this suit occurred in 1972 or sooner, the provisions of the Employee Retirement Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.*, are inapplicable.

2. Judge Knapp concluded that his jury instructions were plainly erroneous. We express no opinion on this question.

3. Except where specifically noted, our statement of the facts conforms to the rules applicable on review of directed verdicts. We must resolve all issues of credibility in favor of appellant, *Brady v. Southern Railway Co.*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 88 L.Ed. 239 (1943), and draw all reasonable inferences from the evidence viewed in the light most favorable to him, *Wyper v. Providence Washington Insurance Co.*, 533 F.2d 57, 58 (2d Cir. 1976). We need not, however, overlook uncontroverted evidence unfavorable to appellant, *National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953, 956 (2d Cir. 1978); 5A Moore's Federal Practice ¶ 50.02[1], at 50–38 to –39 (1977 ed.).

sion, appellant protested and refused to sign classification papers tendered to him. He then brought this action to challenge GM's determination.

█ Both sides have agreed that, notwithstanding the contractual provision to the effect that GM's management should be "the sole judge" of separation classifications, under New York law applicable in this diversity case, GM's decision could be set aside by the court only if appellant could sustain the heavy burden of establishing that the challenged benefit decision was the result of bad faith, fraud, or arbitrary action.[4] *Gitelson v. DuPont*, 17 N.Y.2d 46, 268 N.Y.S.2d 11, 215 N.E.2d 336 (1966); *Pasternak v. Diamond*, 3 A.D.2d 422, 161 N.Y.S.2d 277 (1st Dept. 1957) (per curiam), *aff'd mem.*, 5 N.Y.2d 770, 179 N.Y.S.2d 864, 154 N.E.2d 141 (1958). See *Wyper v. Providence Washington Insurance Co.*, 533 F.2d 57 (2d Cir. 1976) (same standard under Conn. law). Under this standard it is not enough to persuade a judge or jury that the decision may have been incorrect. If the decision is supported by a reasonable basis "[t]he court may not substitute its judgment for that of the trustees [here GM's management] on the disputed factual issues," *Pasternak v. Diamond, supra*. The test, therefore, is not what the court would have done under the circumstances but whether, viewing the evidence most favorably to appellant, it can be concluded that no reasonable basis existed for GM's decision.

█ In this case there was no evidence that appellant's classification as a "special separation" was the product of fraud or bad faith. Accordingly, the question here—as below—is whether appellant adduced sufficient evidence to enable a reasonable jury to conclude that the classification was arbitrary. See 5A Moore's Federal Practice ¶ 50.02[1], at 50–24 (1977 ed.).

At trial Baldwin, the official responsible in the first instance for appellant's classification, testified that he had resolved the issue of appellant's classification by reference to the provision in GM's handbook quoted above and that, in the words of the handbook, he had concluded that appellant was separated ". . . under mutually satisfactory conditions for the purpose of becoming a dealer . . . ."

Baldwin also testified at some length regarding the circumstances underlying this conclusion. He stated:

"First of all, Mr. Daley and Mr. Gehrhardt had indicated very early their desire to become a General Motors franchise dealer. They made a formal request for a dealership. They followed that up with the necessary documentation, and in our evaluation of that situation it was that they asked us to consider them as a dealer and not as an employee.

"They received from General Motors Corporation the franchise which was a very, very valuable franchise, one of the most valuable in the automobile business.

\* \* \* \* \* \*

"We knew that they would be receiving from the General Motors Holding a substantial loan in order to go into business. We knew that they would have a source of employment as a General Motors dealer at a substantial salary. We, in making the determination, were aware of the similar circumstances that occurred in other cities, the way we handled terminations in Chicago, Detroit, Los Angeles and San Francisco, where this sort of thing had occurred." (Tr. 273–75).

Baldwin further stated that he had thought it proper to distinguish between appellant, who was to become a Cadillac dealer, and those other GM employees who planned to become *employees of* dealers, since dealers have more job security and better future prospects than their employees. Finally, Baldwin testified that appellant had at no time during their numerous conversations in the spring of 1972 raised the possibility that he be continued in GM's

---

**4.** Appellant has urged us to construe GM's handbook strictly against the corporation. We believe that the New York rule requiring that decisions of management as "the sole judge" of separation classifications be non-arbitrary does just that.

employ in some new position after its reorganization.

Appellant maintains that he adduced sufficient proof to enable the jury to conclude that Baldwin's rationale for his classification was insincere, unreasonable and arbitrary. He points to evidence from which the jury might have inferred (1) that, notwithstanding his long-standing expressed ambition to be a dealer, appellant's advancing age had led him to favor continued employment with GM; (2) that Baldwin was under the misimpression that GM might allow appellant to remain in the corporation; (3) that the financial prospects of the Brooklyn dealership were uncertain at the time appellant and Daly acquired it;[5] and (4) that Baldwin's testimony that appellant's separation was "mutually satisfactory" represented a shift in position from earlier statements to him that he had been classified as a "quit." Appellant contends that the jury might have discounted Baldwin's explanation and concluded on the basis of this evidence that GM's determination that appellant's separation was "mutually satisfactory" was arbitrary.

The trial judge disagreed. Explaining that he was stating "no fact . . . which is unfavorable to [appellant's] position unless it stands uncontested in the record," Judge Knapp reviewed the evidence and held that GM's decision was not arbitrary. He noted appellant's efforts to impeach the corporation's conclusion, but concluded that GM "was entitled to give greater weight to the overwhelming evidence of plaintiff's life-long ambition and to his failure to request of any corporate official that he be considered for further employment within the corporation." 434 F.Supp. at 986.

On appeal appellant reiterates his position that the evidence created an issue of fact concerning GM's alleged arbitrariness. He attributes Judge Knapp's contrary conclusion to two supposed errors in the standards applied. First, he claims that Judge Knapp did not in fact adhere to his expressed standard for reviewing evidence relevant to GM's motion for judgment notwithstanding the verdict. Second, he argues that Judge Knapp improperly treated this case as though it involved the determination of a pension board on a record developed at a hearing.

## DISCUSSION

Having agreed that GM would be the "sole judge" of separation classifications, appellant, in the absence of any claim of bad faith or fraud, assumed the burden of establishing that GM's classification of him was arbitrary. See *Gitelson v. DuPont*, 17 N.Y.2d 46, 268 N.Y.S.2d 11, 215 N.E.2d 336 (1966), and decisions cited *supra*, p. 11. Appellant was thus obligated to demonstrate the absence of any rational factual basis for GM's classification or that GM in fact made its decision without reference to relevant facts and contractual provisions, see *Miller v. Associated Pension Trusts, Inc.*, 541 F.2d 726, 729 (8th Cir. 1976) (failure to follow proper procedures shown, but no prejudice); *Siegel v. First Pennsylvania Banking & Trust Co.*, 248 F.Supp. 249, 251 (E.D.Pa.1965) (evidence that benefit decision was mere "rubber stamp" of management threat without regard to facts).[6] Although the district court might have been aided in resolving the issue by the existence of an administrative record of the type usually made by government agencies employing more formal procedures (including notice, hearing and a contemporaneous statement of reasons), see, e. g., *Pasternak v. Diamond, supra*, no such procedure was legally mandated in this

---

5. There was evidence that the GM retail operation in Brooklyn had lost close to a million dollars in the years between 1969 and 1971, but GM officials anticipated that private parties could operate an independent dealership profitably.

6. But cf. *Wyper v. Providence Washington Insurance Co., supra*, 533 F.2d at 62 (where pension board has not acted because of plaintiff's failure to request relief, "[i]f the board could have fairly decided against appellant upon the evidence ultimately presented before the court, that would be the end of it in the absence of bad faith or fraud.").

strictly private contractual relationship. The evidence taken by the district court, which includes the trial testimony of some of the principal figures involved, even when viewed most favorably to appellant, demonstrates conclusively that appellant has failed to meet either of the foregoing tests.

We recognize that there was some evidence before GM tending to support appellant's contention that he should be classified as a "lay-off" rather than as a "special separation," including (1) his advancing years, which might have led him to favor continued employment by GM, (2) GM's initial classification of him as a "quit," (3) the poor financial prospects for the Brooklyn dealership, and (4) appellant's refusal to accept the benefit classification assigned to him. However, bearing in mind that the test is not whether GM might have justifiably classified appellant differently but whether a rational basis existed for the classification it did make, it is of controlling significance for present purposes that GM had before it certain undisputed facts which provided such a rational basis.

Appellant's file with GM disclosed that as early as 1965 and 1967 he had expressed his desire to become a dealer, characterizing his goal in one letter as a "lifelong ambition". In 1971, when appellant first found out that GM was closing down its Cadillac retail organization in New York, he immediately applied for the Bronx dealership rather than seek a new post within GM itself. Finally, when he was promised the Brooklyn dealership, it was known that appellant would receive substantial financing assistance from GM—as well as the enhanced opportunity and satisfaction associated with the ownership of one's own business—distinguishing him from those persons who were terminated by GM and became employees of dealers.[7] In short, the information available to GM in the spring of 1972 was more than adequate to support a finding that appellant would be leaving GM "under mutually satisfactory conditions . . . for the purpose of becoming [the Brooklyn Cadillac] dealer."[8]

Thus the existence of some evidence supporting appellant's claim did not eliminate the undisputed reasonable basis for the classification he received. At best, the evidence demonstrated only a conflict in the facts bearing on whether appellant should be denoted a "special separation." Under such circumstances, a reasonable jury would not have been entitled to "substitute its judgment for that of [GM's management] on the disputed factual issues."

Faced with evidence that provides a rational basis for GM's classification, appellant argues that a jury trial was neverthe-

---

7. While GM's definition of "special separation" was potentially applicable to those who were to become employees of the new GM dealers, these employees were much less likely to have been terminated "under mutually satisfactory conditions."

Moreover, the fact that GM may have chosen to waive the strict terms of its contract with this group would not suggest that appellant's classification was arbitrary within the terms of GM's benefit plan. Upon receiving the Brooklyn dealership appellant, on May 16, 1972, applied to Motors Holding Corporation, GM's dealer financing division, for financial assistance in the amount of $369,000, which was awarded. The Brooklyn franchise turned out to be very profitable. The loan was paid off in two years. Sales increased to $14 million by 1976. During the same period appellant's salary increased from $32,000 per year with GM to $50,000 per year plus a $148,000 bonus in 1976 and other benefits, which he earned as an independent dealer.

8. The phrase "under mutually satisfactory conditions" is not free of ambiguity. We understand the parties to agree that a GM employee who leaves the corporation and becomes a dealer need not be happy with every consequence of such a move to be "satisfied" within the terms of the contract. If this were the case, the resistance of such a person to the possible reduced benefits resulting from his move alone would suffice to establish "dissatisfaction," and GM could never claim the benefit of its "special separation" provision. We believe that the test must entail some comparison of the totality of what the employee gives up and what he gets in return in light of his bona fide priorities. Resistance to some consequences of such a job change would not negate the possibility that it might nevertheless be "mutually satisfactory." In any event, there is no evidence that GM has sought an unreasonable interpretation of this language.

**14**

less required to assess the credibility of Baldwin, who bore the prime responsibility for the classification, since the classification might be rejected as arbitrary if the jury found that Baldwin acted for impermissible reasons rather than on the basis of the evidence in the record supporting his classification. The simple answer is that, even when the credibility issue is resolved in appellant's favor, appellant cannot point to any proof of bad faith, ill will, bias, prejudice, defective GM decision-making, or other facts indicating that the classification decision was not in fact reached by reference to the contract provision and relevant facts. Aside from Baldwin's testimony, the record remains either undisputed or corroborated by evidence of unquestioned authenticity to the effect that appellant had a longstanding ambition to be a dealer, that his 1972 efforts to become a dealer far exceeded the effort he expended in attempting to remain in GM, that the classification of appellant and Daly as "special separations" was in accordance with prior practice in other cities, and that appellant had received financing from GM as part of the arrangements underlying his acquisition of the Brooklyn dealership. In light of this corroboration, appellant failed to sustain his burden of introducing evidence from which the jury might reasonably have concluded that GM had based appellant's classification on circumstances other than the relevant facts available to it.

■ As we stated in *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 743–43 (2d Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969)):

> "If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judg-

ment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury."

■ In this case the facts and inferences pointed overwhelmingly in favor of the conclusions (1) that appellant's classification was supported by a reasonable basis; and (2) that the procedure underlying it was adequate. Accordingly, there was no question of fact for the jury as to the arbitrariness of appellant's classification.

The judgment of dismissal is affirmed.